**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| CHRISTOPHER MEYER, SARAH MEYER, and THE NATIONAL FEDERATION OF THE BLIND, INC., | &#124; <br> &#124; <br> &#124; <br> &#124; |
| Plaintiffs, | &#124; <br> &#124; |
| v. | &#124; <br> &#124; |
| JENNIFER WALTHALL, in her official capacity as Secretary of the Indiana Family and Social Services Administration, and ADRIENNE SHIELDS, in her official capacity as Director of the Indiana Division of Family Resources, | &#124; <br> &#124; <br> &#124; <br> &#124; <br> &#124; <br> &#124; |
| Defendants. | &#124; <br> &#124; |

Case No. 1:19-cv-3311-JMS-TAB

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Joseph B. Espo
Chelsea J. Crawford
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869
jbe@browngold.com
ccrawford@browngold.com

Thomas E. Crishon
Emily A. Munson
INDIANA DISABILITY RIGHTS
4701 North Keystone Avenue, Suite 222
Indianapolis, Indiana 46205
T:  (317) 722-5555
F:  (317) 722-5564
tcrishon@indianadisabilityrights.org
emunson1@indianadisabilityrights.org

Jana Eisinger
LAW OFFICE OF JANA EISINGER, PLLC
4610 South Ulster Street, Suite 150
Denver, Colorado 80237
T:  (303) 209-0266
F:  (303) 353-0786
jeisinger@eisingerlawfirm.com

*Counsel for Plaintiffs*

October 6, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ................................. 1

    I.    Plaintiffs Christopher Meyer, Sarah Meyer, and the National Federation of the Blind, Inc. ..................................................................................... 1

    II.    Defendants' Public Benefits Programs ................................................... 4

    III.    Defendants' Inaccessible Print Documents .......................................... 5

    IV.    Defendants' Websites ............................................................................ 6

               DFR's Benefits Portal ............................................................................ 7

               FSSA Homepage and Indiana Medicaid ................................................ 8

    V.    Barriers on Defendants Websites .......................................................... 8

        A.    Testing and Barriers Admitted by Defendants .......................... 8

             Benefits Portal ........................................................................ 8

        B.    Testing and Barriers Identified by Plaintiffs' Expert ................. 9

             Benefits Portal ........................................................................ 9

             FSSA Homepage .................................................................. 10

             Indiana Medicaid .................................................................. 11

STANDARD OF REVIEW ............................................................................... 12

ARGUMENT .................................................................................................... 12

    I.    The Individual Plaintiffs and Other Members of the National Federation of the Blind, Inc. Are Qualified Individuals with Disabilities Under the ADA and Section 504 ...................................................................................... 13

        A.    Christopher Meyer, Sarah Meyer, and other NFB members, including Kaiti Shelton, are individuals with disabilities. ........ 13

        B.    Christopher Meyer, Sarah Meyer, and other NFB members residing in Indiana are qualified individuals ............................. 14

    II.    Defendants' Public Benefits Programs and Websites Are Services, Programs, or Activities Subject to Title II of the ADA and Section 504. ........... 15

III.    Defendants Are Violating Title II of the ADA and Section 504. ........................ 18

    A.    Defendants' print communications are inaccessible to the blind.............. 20

        1.    Defendants' Braille documents are low-quality and demonstrate a lack of knowledge regarding proper Braille production. ........................... 21

        2.    Defendants' contractors continue to provide inaccessible standard print documents............................. 23

    B.    Accessibility barriers exist on Defendants' websites............................... 24

        3.    Accessibility barriers pervade the Benefits Portal. ........... 25

        4.    Accessibility barriers are present on Defendants' other webpages................................................................. 27

        5.    Defendants lack policies and procedures to identify and remediate accessibility barriers. ................................ 28

IV.    This Court Should Award Plaintiffs Injunctive Relief. ......................................... 29

    A.    Plaintiffs Satisfy the Four-Prong Test for Injunctive Relief. ................... 30

    B.    This Court Should Grant a Permanent Injunction Requiring Defendants and their Contractors to Provide Equal Access to Print Communications in Secure, Accessible Formats....................................... 32

    C.    This Court Should Grant a Permanent Injunction Requiring Defendants to Remediate Existing Website Barriers and Implement a Six-Part Protocol to Maintain Web Accessibility. ................................. 34

CONCLUSION...................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 12

*Ashby v. Warrick Cnty. Sch. Corp.*,
  908 F.3d 225 (7th Cir. 2018)..................................................................................... 15

*Doe v. Mutual of Omaha Ins. Co.*,
  179 F.3d 557 (7th Cir. 1999)..................................................................................... 16

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ................................................................................................ 30

*Hindel v. Husted*,
  No. 2:15-cv-3061, 2017 WL 432839 (S.D. Ohio Feb. 1, 2017) .............................. 16

*Innes v. Bd. of Regents of the Univ. Sys. of Md.*,
  No. DKC-13-2800, 2015 WL 1210484  (D. Md. Mar. 16, 2015)............................. 16

*Love v. Westville Corr. Ctr.*,
  103 F.3d 558 (7th Cir.1996)...................................................................................... 12

*Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers,*
  *AFL-CIO-CLC*,
  268 F.3d 456 (7th Cir. 2001)..................................................................................... 16

*Mortland v. Lights Out Developments, LLC*,
  No. 1:19-CV-2557-JMS-DLP, 2020 WL 3577867 (S.D. Ind. July 1, 2020) .......................... 32

*Olmstead v. L.C.*,
  527 U.S. 581 (1999) ................................................................................................. 16

*Steimel v. Wernert*,
  823 F.3d 902 (7th Cir. 2016)..................................................................................... 16

*Vaughn v. Walthall*,
  968 F.3d 814 (7th Cir. 2020)............................................................................... 12, 30

*Wagoner v. Lemmon*,
  778 F.3d 586 (7th Cir. 2015)..................................................................................... 12

*Washington v. Indiana High Sch. Athletic Ass'n, Inc.*,
  181 F.3d 840 (7th Cir. 1999)..................................................................................... 14

**Statutes**

29 U.S.C. § 794 ................................................................................................................... passim

42 U.S.C. § 12102 ....................................................................................................................... 13

42 U.S.C. § 12131 ..................................................................................................................... 1, 14

42 U.S.C. § 12132 ................................................................................................................. 1, 17−18

42 U.S.C. § 12133 ......................................................................................................................... 1

42 U.S.C. § 12134 ......................................................................................................................... 1

42 U.S.C. § 12206 ....................................................................................................................... 19

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................................... 12

**Regulations**

28 C.F.R. § 35.102 ..................................................................................................................... 15

28 C.F.R. § 35.108(d)(2)(iii)(B) ................................................................................................ 13

28 C.F.R. § 35.130(b)(1) ........................................................................................................... 19

28 C.F.R. § 35.130(b)(1)(i) ....................................................................................................... 19

28 C.F.R. § 35.130(b)(1)(ii) .................................................................................................. 19, 20

28 C.F.R. § 35.130(b)(1)(iii) ..................................................................................................... 19

28 C.F.R. § 35.130(b)(7)(i) ....................................................................................................... 19

28 C.F.R. § 35.150(a)(3) ........................................................................................................... 31

28 C.F.R. § 35.160 ..................................................................................................................... 20

28 C.F.R. § 35.160(b)(2) ........................................................................................................... 20

28 C.F.R. § 35.164 ..................................................................................................................... 31

28 C.F.R. § 41.53 ....................................................................................................................... 31

28 C.F.R. § Pt. 35, App. A ......................................................................................................... 15

28 C.F.R. § Pt. 35, App. B ..................................................................................................... 15, 19

45 C.F.R. § 84.4(b)(1)(ii)-(iii) ................................................................................................... 19

45 C.F.R. § 84.52(a)(2)-(3) ........................................................................................................ 19

## INTRODUCTION

Defendants Jennifer Sullivan (nee Walthall), in her official capacity as Secretary of the Indiana Division of Family and Social Services Administration ("FSSA"), and Adrienne Shields, in her official capacity as Director of the Indiana Division of Family Resources ("DFR"), (collectively "Defendants") discriminate against blind individuals on the basis of their disability by failing to provide them with communication that is equally effective as communication with sighted persons—both in print material and through their websites. Defendants fail to consistently provide print correspondence to Plaintiffs in accessible alternative formats, namely Braille. Defendants' websites are not equally available to blind individuals because they have not been created or maintained in a manner compatible with screen access software that many blind individuals utilize to access information on the Internet. Defendants' denial of equal treatment as described in this Memorandum of Law constitutes a violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131–12134, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

I.   **Plaintiffs Christopher Meyer, Sarah Meyer, and the National Federation of the Blind, Inc.**

Plaintiffs Christopher Meyer and Sarah Meyer are blind as a result of Leber's Congenital Amaurosis. [Filing No. 66-3 at 6–7 (C. Meyer Dep. at pp. 10:25–11:24)]; [Filing No. 66-4 at 8 (S. Meyer Dep. at p. 9:1–16)]; [Filing No. 66-5 at 3]; [Filing No. 66-6 at 3.]. They are members of the National Federation of the Blind, Inc. [Filing No. 66-3 at 25–26 (C. Meyer Dep. pp. 46:13–47:8)]; [Filing No. 66-4 at 28 (S. Meyer Dep. 38:13–18).]. They each read Braille and rely on Braille to read standard print documents. [Filing No. 66-5 at 4]; [Filing No. 66-4 at 51 (S. Meyer Dep. 62:19–25)]; [Filing No. 66-6 at 4.]. They also utilize screen readers to access the

Internet. [Filing No. 66-3 at 11–12 (C. Myer Dep. pp.15:15–16:25)]; [Filing No. 66-4 at 12–13 (S. Meyer Dep. pp. 13:16–14:2)]; [Filing No. 66-5 at 4]; [Filing No. 66-6 at 4.]. A screen reader is a software application that conveys to a blind person through non-visual means what sighted people see on a screen, often by using text-to-speech functionality. [Filing No. 66-26 at 3, ¶ 8.]. Job Access with Speech, or JAWS and NonVisual Desktop Access, or NVDA, are screen readers. [Filing No. 66-26 at 3, ¶ 8.].

Christopher and Sarah Meyer receive public assistance benefits from FSSA and DFR, including Medicaid and Supplemental Nutrition Assistance Program ("SNAP") benefits. [Filing No. 66-3 at 17–18 (C. Meyer Dep. pp. 21:25–22:20)]; [Filing No. 66-4 at 21 (S. Meyer Dep. p. 27:10–24).]. Since at least 2017, Christopher Meyer has made more than a dozen requests to FSSA and DFR to send all print correspondence in Braille. [Filing No. 66-5 at 6–9]; [Filing No. 66-27 at 2–6, 20, 22, 25–26, 28, 32–33, 35]; [Filing No. 66-30 at 2.]. In September 2017, Mr. Meyer was disenrolled from Medicaid because he did not submit the required documentation to remain eligible. [Filing No. 66-5 at 4–5.]. Mr. Meyer could not read the print notices from FSSA and DFR requesting verification information and therefore missed the deadline to respond. [Filing No. 66-5 at 4–5]; [Filing No. 66-27 at 8.]. In March 2018, Mr. Meyer attempted to re-enroll for benefits by visiting Defendants' website, the FSSA Benefits Portal, but was unable to complete the application because the website was not accessible with screen access software. [Filing No.66-5 at 5–6]; [Filing No. 66-3 at 43–44 (C. Meyer Dep. pp. 64:11–65:4).]. In May 2018, Mr. Meyer was denied Medicaid benefits under the Healthy Indiana Plan due to a failure to submit income verification information by the deadline. [Filing No. 66-27 at 2.] Mr. Meyer appealed the denial of benefits, but later dropped the administrative appeal [Filing No. 66-5 at 10–11.].

The health insurance provider for Mr. Meyer's Medicaid benefits is Managed Health Services ("MHS"). [Filing No. 66-12 at 2, ¶ 2.]. Mr. Meyer has requested MHS to provide him all print communications in Braille, including most recently in January 2020; however MHS continues to send Mr. Meyer only standard print documents. [Filing No. 66-12 at 2, ¶ 3.]. As a result, Mr. Meyer has been unable to read important notices regarding denials of coverage, insurance overpayments, and past due payments. [Filing No. 66-12 at 2–3, ¶¶ 4–6.].

Sarah Meyer was disenrolled from Medicaid in 2010 due to a failure to submit documentation verifying her income and resources. [Filing No. 66-6 at 4–5]; [Filing No. 66-4 at 51–52 (S. Meyer Dep. pp. 62:7–63:4)]; [Filing No. 66-28 at 2.]. Ms. Meyer was unable to read the print notice requesting the documentation and therefore did not submit the information within the deadline. [Filing No. 66-6 at 4–5]; [Filing No. 66-4 at 51–52 (S. Meyer Dep. pp. 62:10–63:8).]. Ms. Meyer contacted FSSA and DFR several times, including in March 2014, June 2014, and May 2019, to notify the agencies that she could not read print notices and to request all print correspondence in Braille. [Filing No. 66-6 at 5–6]; [Filing No. 66-29 at 3, 15, 16.].

Plaintiff the National Federation of the Blind, Inc. ("NFB") is a non-profit corporation and the oldest and largest national organization of blind individuals. [Filing No. 66-7 at 3–4.]. The NFB's mission is to "promote[] the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, health care, employment, family and community life, transportation, and recreation." [Filing No. 66-7 at 3–4]. The NFB has expended time and efforts towards ensuring that Defendants' print communications and websites comply with federal law. [Filing No. 66-7 at 5–8.].

3

The NFB has approximately 113 members who reside in Indiana, at least six of whom receive government benefits through FSSA and/or DFR. [Filing No. 66-7 at 4–5.]. Kaiti Shelton is a member of the NFB. [Filing No. 66-11 at 2, ¶ 1.]. She, too, has requested that FSSA and DFR provide all print correspondence in an alternative format, namely Braille or an accessible electronic copy. [Filing No. 66-11 at 3, ¶ 5.]. Ms. Shelton requested Braille correspondence on April 18, 2019, April 25, 2019, May 14, 2019, and May 20, 2019. [Filing No. 66-11 at 3, ¶ 6]; [Filing No. 66-37 at 2–4]; [Filing No. 66-11 at 3, ¶ 6.]. She has yet to receive any Braille documents from Defendants. [Filing No. 66-11 at 3, ¶ 7.]. Ms. Shelton also does not consistently receive accessible print communications from Defendants' contractors. [Filing No. 66-11 at 3, ¶ 9.]. One such contractor is MHS, a health insurance plan servicing eligible Indiana Medicaid recipients. [Filing No. 66-11 at 2–3, ¶¶ 2, 8–9.]. Ms. Shelton has received some brochures, flyers, and general information in an accessible electronic format, but continues to receive only standard print for correspondence and documents specific to her membership. [Filing No. 66-11 at 3, ¶ 9.].

## II.    Defendants' Public Benefits Programs

FSSA and DFR are agencies, divisions, or instrumentalities of the State of Indiana and are therefore public entities subject to Title II of the ADA. [Filing No. 66-8 at 5–6.]. Defendants also receive federal financial assistance and are subject to Section 504. [Filing No. 66-8 at 6–7.]. Defendant FSSA is the agency responsible for administering Indiana's public assistance programs, and DFR is a division of FSSA responsible for administering Medicaid, SNAP, and Temporary Assistance for Needy Families ("TANF") benefits. [Filing No. 66-14 at 7–10 (A. Shields Dep. pp. 45:17–46:19; 47:20–48:18).].

### III.   Defendants' Inaccessible Print Documents

In late August 2019, following the filing of Plaintiffs' lawsuit, DFR implemented a policy by which it would record and fulfill requests for large print or Braille documents as alternatives to standard print correspondence. [Filing No. 66-20 at 5–6, 9, 13–14 (DFR 30(b)(6) A. Shields Dep. pp. 12:8–13:14; 16:13–21; 20:10–21:5).]. DFR designated Jasmine Holliday as the primary person to fulfill such requests. [Filing No. 66-20 at 21–22 (DFR 30(b)(6) A. Shields Dep. pp. 42:16–43:6).]. DFR purchased a Braille embosser after September 2019 and thereafter began producing its own Braille correspondence. [Filing No. 66-20 at 29, 32 (DFR 30(b)(6) A. Shields Dep. 90:7–17, 93:1–94:16)]; [Filing No. 66-35 at 2–3]; [Filing No. 66-36 at 2.]. Jasmine Holliday is the only DFR employee trained to use the Braille embosser. [Filing No. 66-20 at 35–36 (DFR 30(b)(6) A. Shields Dep. pp. 96:20–97:2).]. DFR believes that Braille should be readable and accurate. [Filing No. 66-20 at 41–42 (DFR 30(b)(6) A. Shields Dep. pp. 102:18–103:2).]. However, it does not evaluate or monitor the quality of Braille produced by Ms. Holliday, and no one within DFR reads Braille. [Filing No. 66-20 at 38, 41–42 (DFR 30(b)(6) A. Shields Dep. pp. 99:1–6, 102:15–17, 103:3–104:6).]. Defendants did not begin to send Mr. Meyer Braille documents until after August 7, 2019. [Filing No. 66-3 at 30 (C. Meyer Dep. p. 51:6–9)]; [Filing No. 66-27 at 25). Defendants did not begin to send Ms. Meyer Braille documents until after September 26, 2019. [Filing No. 66-29 at 2.].

Plaintiffs Christopher Meyer and Sarah Meyer reported several problems with the Braille they received from Defendants, including errant symbols, uncollated pages, and Braille printing along page perforations. [Filing No. 66-3 at 36–38 (C. Meyer Dep. pp. 57:24–59:25)]; [Filing No. 66-4 at 35–39 (S. Meyer Dep. pp. 46:25–50:5).]. Plaintiffs' Braille expert, Jennifer Dunnam, reviewed several Braille documents Christopher Meyer received, and thermoform copies of those documents, and confirmed problems with the quality of the Braille. [Filing No. 66-25 at 9–13.].

5

Jennifer Dunnam reported that some documents were Brailled in ASCII or "computer Braille" which lacks standard Braille translation. [Filing No. 66-25 at 11]; [Filing No. 66-24 at 5–6 (J. Dunnam Dep. pp. 18:13–19:25).]. As a result, punctuation and symbols are represented with different characters from what should appear in a standard Braille document. [Filing No. 66-25 at 11.]. Ms. Dunnam also reported that the margins in some documents were not respected, resulting in unreadable lines of text. [Filing No. 66-25 at 11.]. Pages were not collated and material in tables were presented in a list without the proper formatting. [Filing No. 66-25 at 11]; [Filing No. 66-24 at 15–19 (J. Dunnam Dep. pp. 41:22–44:19; 44:22–45:15).]. Some Braille documents contained extra symbols and characters. [Filing No. 66-25 at 12–13.]. Several documents had large sections of blank space and improper paragraph formatting. [Filing No. 66-25 at 12]; [Filing No. 66-24 at 7 (J. Dunnam Dep. p. 20:2–16).]. Ms. Dunnam concluded that most documents "reflect[] "little to no knowledge on the part of the preparer of how to properly format and translate a Braille document or how to verify a Braille document for accuracy." [Filing No. 66-25 at 13.]. The quality of the Braille was so poor as to render the documents "impossible to read, or would take hours for a reader to understand." [Filing No. 66-25 at 13.].

## IV.    Defendants' Websites

DFR does not maintain any written policies on website accessibility, nor does it maintain any written or internal policies regarding website testing and compliance for accessibility purposes. [Filing No. 66-14 at 42, 45 (A. Shields Dep. pp. 180:2–4, 183:5–9).]. When DFR works with vendors and contractors, its expectations regarding compliance with federal law and website accessibility are included in contractual language in the Request for Proposal ("RFP") and the executed contract. [Filing No. 66-14 at 42–44 (A. Shields Dep. pp. 180:17–182:4)]; [Filing No. 66-21 at 56–57 (DFR 30(b)(6) J. Montgomery Dep. pp. 76:15–77:9).]. DFR believes

that the process for completing and submitting benefits applications online should be accessible to the blind. [Filing No. 66-21 at 13 (DFR 30(b)(6) Dep. J. Montgomery p. 15:7–14).].

*DFR's Benefits Portal*

The Benefits Portal is "an intake mechanism for Medicaid, SNAP and TANF eligibility applications to comply with the federal requirements for those same three." [Filing No. 66-17 at 39 (J. Montgomery Dep. p. 87:1–12).]. The Benefits Portal allows Medicaid, SNAP, and TANF "clients or authorized representatives or citizens in general to apply for Indiana-provided social service—or social – social program assistance." [Filing No. 66-21 at 47–48 (DFR 30(b)(6) J. Montgomery Dep. pp. 67:19–68:10)]; [Filing No. 66-16 at 7 (S. Beam Dep. p. 26:17–21).]. The Benefits Portal also provides "downstream tools" such as, checking the status of pending applications, checking eligibility status, and changing status. [Filing No. 66-21 at 48–49 (DFR 30(b)(6) J. Montgomery Dep. pp. 68:6–69:6).]. Traffic on the Benefits Portal totals in the "hundreds of thousands over the course of a year." [Filing No. 66-21 at 10–11(DFR 30(b)(6) Dep. J. Montgomery pp. 12:19–13:21).]. Online applications are the most popular method for applying for benefits and account for 60 to 80 percent of applications. [Filing No. 66-21 at 12–13 (DFR 30(b)(6) Dep. pp. J. Montgomery 14:12–15:6).].

While DFR controls the Benefits Portal website, it has contracted with RCR Technology for management of the Benefits Portal. [Filing No. 66-14 at 38 (A. Shields Dep. p. 176:3–7)]; [Filing No. 66-21 at 15 (DFR 30(b)(6) Dep. J. Montgomery p. 17:8–11)]; [Filing No. 66-22 at 7 (G. Hart Dep. p. 26:4–17).]. Other than the requirement in the RFP that contractors comply with federal law, DFR does not provide any additional guidance regarding accessibility requirements. [Filing No. 66-17 at 18 (J. Montgomery Dep. p. 61:2–20)]; [Filing No. 66-22 at 7–8 (G. Hart Dep. pp. 26:18–27:6).]. DFR delegates compliance with federal law to RCR technology. [Filing No. 66-14 at 51 (A Shields Dep. p. 189:9–20).]. DFR has also delegated all accessibility testing

7

and maintenance of the Benefits Portal to RCR Technology. [Filing No. 66-21 at 20–21 (DFR 30(b)(6) J. Montgomery pp. 22:19–23:2)]; [Filing No. 66-16 at 14 (S. Beam Dep. p. 46:13–20).]. DFR does not perform any reviews or testing of the Benefits Portal for accessibility. [Filing No. 66-21 at 23–24 (DFR 30(b)(6) Dep. J. Montgomery pp. 25:12–26:1)]; [Filing No. 66-16 at 16–17 (S. Beam Dep. 48:19–49:1).]. DFR also does not perform any compliance monitoring for accessibility purposes. [Filing No. 66-17 at 20–24 (J. Montgomery Dep. pp. 63:12–67:3).].

### FSSA Homepage and Indiana Medicaid

The FSSA homepage (www.IN.gov/FSSA) "is meant to be the home page and the front door of [the] agency" and is akin to a landing page for visitors to "steer people in all of the right directions to – help them get services." [Filing No. 66-19 at 39 (FSSA 30(b)(6) Dep. J. Linder p. 77:5–15).]. Similarly, the Indiana Medicaid website (www.IN.gov/Medicaid) is the "home page and landing page" for Indiana Medicaid. [Filing No. 66-19 at 46–47 (FSSA 30(b)(6) Dep. J. Linder pp. 86:14–87:19).]. The FSSA home page and the Indiana Medicaid landing page are owned by FSSA and managed by Indiana Interactive, a State contractor. [Filing No. 66-19 at 7, 9–11 (FSSA 30(b)(6) J. Linder pp. 45:15–21; 47:8–49:11)]; [Filing No. 66-10 at 10–11.]. FSSA controls the content and color scheme of the FSSA homepage and Indiana Medicaid page, but it does not control the domain, hosting, or technical development. [Filing No. 66-19 at 54–55 (FSSA 30(b)(6) J. Linder Dep. pp. 115:11–116:5).].

### V.   Barriers on Defendants' Websites

#### A.   Testing and Barriers Admitted by Defendants

### Benefits Portal

Three different individuals or entities tested the DFR Benefits Portal for accessibility: Ron Mis, Joe Montgomery, and RCR Technology. [Filing No. 66-21 at 24 (DFR 30(b)(6) J. Montgomery p. 26:2–17).]. DFR employee Ron Mis completed testing of the Benefits Portal

using JAWS and was unable to independently access the online application, due to accessibility barriers on the website. [Filing No. 66-38 at 2–4]; [Filing No. 66-14 at 58–64 (A. Shields Dep. pp. 198:10–204:20).]. The testing performed by Joe Montgomery, an information technology contractor reporting to FSSA and DFR was "informal" "not exhaustive" and "cursory." [Filing No. 66-17 at 7 (J. Montgomery Dep. p. 15:7–13)]; [Filing No. 66-21 at 75–77 (DFR 30(b)(6) J. Montgomery Dep. pp. 109:2–111:19).]. RCR Technology performed accessibility testing on three dates—August 7, 2019, September 12, 2019, and September 24, 2019—and reported several barriers or "limitations" to DFR. [Filing No. 66-21 at 31–32 (DFR 30(b)(6) J. Montgomery Dep. pp. 45:1–46:7)]; [Filing No. 66-22 at 15–16 (G. Hart Dep. pp. 46:8–47:10)]; [Filing No. 66-31 at 2]; [Filing No. 66-32 at 2–3]; [Filing No. 66-33 at 2–3].

**B.    Testing and Barriers Identified by Plaintiffs' Expert**

Plaintiffs' web accessibility expert, Terri Youngblood, reviewed Defendants' websites and noted many accessibility issues. *See generally* [Filing No. 66-26 at 13–71.]. Ms. Youngblood analyzed Defendants' websites against the World Wide Web Consortium Web Accessibility Guidelines ("WCAG") 2.1, which includes all guidelines in WCAG version 2.0. [Filing No. 66-23 at 7 (T. Youngblood Dep. p. 13:11–20)]; [Filing No. 66-26 at 16.]. All of the accessibility problems that Ms. Youngblood examined can be resolved if Defendants' websites were coded to comply with the WCAG standards. [Filing No. 66-23 at 15 (T. Youngblood Dep. p. 84:12–20).].

*Benefits Portal*

Terri Youngblood observed several barriers on the Benefits Portal website. *See* generally [Filing No. 66-26 at 51–71.]. The orange and white color combination on the pop-up login window that appears on the Benefits Portal page suffers from poor color contrast. [Filing No. 66-26 at 56.]. The "Forgot User ID" and "Forgot Password" links on the pop-up window are not keyboard accessible [Filing No. 66-26 at 57.]. Within the online application for benefits, help

icons are not accessible throughout the application. [Filing No. 66-26 at 58.]. In addition, several text fields where users are required to enter data are not accessible. [Filing No. 66-26 at 59–71.]. At virtually every page in the online application, these "form fields" are not announced via screen access software and a blind user cannot determine what information to enter into the unlabeled fields. [Filing No. 66-26 at 59–71.]. Terri Youngblood concluded that the online application is not fully accessible to the blind due to barriers that prevent blind individuals from completing the form and that the Benefits Portal may be made accessible using proper coding standards. [Filing No. 66-26 at 71.].

***FSSA Homepage***

On the FSSA homepage, Terri Youngblood noted that the search option is not labeled as a button or a link, so a screen reader would interpret the search option as static text only. [Filing No. 66-26 at 23.]. The "advanced search" feature at the bottom of the page is similarly not accessible because the labels identifying the text fields in which a user would enter search terms are not read to screen reader users. [Filing No. 66-26 at 23.]. The side navigation buttons on the FSSA homepage are not recognized as expandable links, so a screen reader user cannot navigate to any pages within the expand controls. [Filing No. 66-26 at 24.].

On the Child Care and Education page, the pop-up window that appears on the "Find Childcare" feature is not focused, so an individual using a screen reader does not know this pop-up window has opened and therefore cannot read any text within the window. [Filing No. 66-26 at 28.]. The text fields allowing a user to filter childcare results is inaccessible to screen reader users. [Filing No. 66-26 at 29.]. Terri Youngblood also reported several problems with tables. [Filing No. 66-26 at 34, 38.]. One table showing monthly limits and the maximum SNAP allotment is not accessible. [Filing No. 66-26 at 34.]. The table headers are not coded properly, so there is no clear relationship between the information in the header cells and data cells. [Filing

No. 66-26 at 34.]. For example, if properly coded, when a blind user tabs through a calendar, JAWS will read Monday the first, Tuesday the second and so on, but the way Defendants have coded tables, JAWS reads the days of the week, in order, and then simply reads the dates, without the associated day information. [Filing No. 66-26 at 4, ¶ 10, 34.]. Another table to determine what is covered by Indiana Medicaid is also not properly marked, resulting in header cells that are not associated with data cells. [Filing No. 66-26 at 38–39.].

Other tools on the website are inaccessible. The HIP Eligibility and Contribution Calculator is not accessible because the fields to enter information are not properly labeled [Filing No. 66-26 at 35.]. Similarly, the option to search and find a local DFR office is not accessible. [Filing No. 66-26 at 34.]. The search box announces "Frame Edit" rather than the label to search for a local DFR office. [Filing No. 66-26 at 34.].

### Indiana Medicaid

The Indiana Medicaid page lacks a visual focus on the main menu. [Filing No. 66-26 at 40.]. The visual focus tool is primarily for keyboard users who rely on keyboard navigation and provides on-screen indications of what objects or links are in focus as a user tabs through a webpage [Filing No. 66-26 at 21.]. The page also suffers from poor color contrast ratio. Color contrast ratios should be 4.5:1, and the orange and white color combination results in a ratio of only 2.9:1. [Filing No. 66-26 at 41.]. The blue background with white text color combination results in a color contrast ratio of 3.9:1. [Filing No. 66-26 at 42.]. The chartreuse background with white text color combination has a color contrast ratio of 1.7:1 [Filing No. 66-26 at 42.]. Menus on the website are not accessible using keyboard navigation. [Filing No. 66-26 at 43.]. At least two documents on the website are not accessible—either because text fields on the document are not fillable, or because the documents are scanned and appeared as a static image rather than readable text. [Filing No. 66-26 at 45.].

**STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The relevant inquiry is "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

**ARGUMENT**

To establish a violation of Title II of the ADA, "the plaintiff must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citing *Love v. Westville Corr. Ctr.,* 103 F.3d 558, 560 (7th Cir.1996)). Entities that receive federal financial assistance are subject to Section 504. 29 U.S.C. § 794(a). Claims under Section 504 are "functionally identical" requiring a plaintiff to allege "(1) he is a qualified person (2) with a disability and (3) the state agency denied him access to a program or activity because of his disability." *Id.* (citation omitted); *see also Vaughn v. Walthall*, 968 F.3d 814, 819 (7th Cir. 2020) (stating that "there is no material difference between [the ADA and the Rehabilitation Act]"). There is no dispute that Defendants are public entities that receive federal financial assistance and are therefore subject to Title II of the ADA and Section 504.

I.     **The Individual Plaintiffs and Other Members of the National Federation of the Blind, Inc. Are Qualified Individuals with Disabilities Under the ADA and Section 504.**

    A.     **Christopher Meyer, Sarah Meyer, and other NFB members, including Kaiti Shelton, are individuals with disabilities.**

The ADA defines "disability," with respect to an individual, as a person with "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "Seeing" is among the major life activities. *See* 42 U.S.C. § 12102(2)(A); *see also* 28 C.F.R. § 35.108(d)(2)(iii)(B) ("Blindness substantially limits seeing[.]"). "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C).

Siblings Christopher and Sarah Meyer live with Leber's Congenital Amaurosis, an eye disorder that causes vision loss. [Filing No. 66-3 at 6–7 (C. Meyer Dep. pp. 10:25–11:24)]; [Filing No. 66-4 at 8 (S. Meyer Dep. p. 9:1–16).]. Mr. Meyer has significant vision loss; he navigates using a cane and cannot read large print. [Filing No. 66-3 at 6–8 (C. Meyer Dep. pp. 10:22–12:3).]. Sarah Meyer also has significant vision loss. She can perceive some light but cannot recognize any types of print, whether standard print or large print. [Filing No. 66-4 at 7–9 (S. Meyer Dep. pp. 8:23–10:9).]. Both Christopher Meyer and Sarah Meyer read Braille and rely on Braille to read print documents. [Filing No. 66-3 at 18 (C. Meyer Dep. p. 22:11–22)]; [Filing No. 66-5 at 3–4]; [Filing No. 66-6 at 3–4]; [Filing No.66-4 at 13–14 (S. Meyer Dep. pp. 14:22–15:12).].

The NFB is a non-profit advocacy organization that "assists[] the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, healthcare, employment, family and community life, transportation, and recreation." [Filing No.

13

66-7 at 3–4.]. The NFB has approximately 50,000 members—113 of whom reside in Indiana. [Filing No. 66-7 at 3–4.]. While some NFB members are sighted, they make up less than five percent of the total membership. *See* [Filing No. 66-13 at 7 (Pres. Riccobono Dep. p. 15:2–9).]. Kaiti Shelton is a blind NFB member residing in Indiana. [Filing No. 66-11 at 2, ¶ 1.]. She cannot read print documents and relies on Braille or accessible electronic formats. [Filing No. 66-11 at 2, ¶ 3.].

**B.    Christopher Meyer, Sarah Meyer, and other NFB members residing in Indiana are qualified individuals.**

"Under Title II, a qualified individual is an individual with a disability, who with or without reasonable modifications to rules meets the essential eligibility requirements for the participation in programs or activities provided by a public entity." *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 849 (7th Cir. 1999) (emphasis omitted); *see also* 42 U.S.C. § 12131(2). Similarly, under the Rehabilitation Act, "an otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap with reasonable accommodation." *Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d at 849. (citation omitted) (emphasis omitted).

Christopher Meyer, Sarah Meyer, and NFB member Kaiti Shelton meet the essential eligibility requirements to participate in Defendants' public benefits programs and to access Defendants' websites concerning those programs. Both Christopher Meyer and Sarah Meyer are residents of Indiana and receive Medicaid and SNAP benefits through FSSA and DFR. *See* [Filing No. 66-39 at 2]; [Filing No. 66-28 at 2.]. Kaiti Shelton is a resident of Indiana and a recipient of Indiana Medicaid benefits. [Filing No. 66-11 at 2, ¶¶ 1–2]. Current and prospective benefits recipients are eligible to use Defendants' websites to obtain information related to the application and receipt of benefits. Indeed, the very purpose of the Benefits Portal website is to

14

allow individuals to submit online applications for Medicaid, SNAP, and TANF benefits. *See* [Filing No. 66-17 at 39 (J. Montgomery Dep. p. 87:1–20) (agreeing that the Benefits Portal "is primarily the public-facing tool that benefits recipients or prospective applicant [sic] can use to submit an application for Medicaid, SNAP or TANF benefits").]. Plaintiffs Christopher Meyer and Sarah Meyer and NFB-members residing in Indiana, like Kaiti Shelton and others, may use the Benefits Portal and Defendants' websites more broadly to access information concerning state benefits. *See* [Filing No. 66-19 at 39 (FSSA 30(b)(6) J. Linder Dep. p. 77:5–19) (describing purpose of FSSA landing page)]; [Filing No. 66-19 at 46–47 (FSSA 30(b)(6) J. Linder Dep. pp. 86:14–87:19) (describing purpose of FSSA Medicaid page).].

## II. Defendants' Public Benefits Programs and Websites Are Services, Programs, or Activities Subject to Title II of the ADA and Section 504.

"[W]hether a particular event is a service, program, or activity *of* a public entity turns on what the public entity itself is doing, providing, or making available. *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018). Title II broadly covers "all services, programs, and activities *provided or made available* by public entities" 28 C.F.R. § 35.102 (emphasis added) and includes "anything a public entity does." 28 C.F.R. § Pt. 35, App. B. Under Section 504, a "program or activity" is also broadly defined and extends to "all of the operations" of the entity. 29 U.S.C. § 794(b)(1)(A).

Websites operated by a public entity are covered by the ADA and Section 504. "[S]uch sites must provide their services in an accessible manner or provide an accessible alternative to the website that is available 24 hours a day, seven days a week." 28 C.F.R. § Pt. 35, App. A.

> Public entities that choose to provide services through web-based applications (e.g., renewing library books or driver's licenses) or that communicate with their constituents or provide information through the Internet must ensure that individuals with disabilities have equal access to such services or information, unless doing so would result in an undue financial and administrative burden or a

> fundamental alteration in the nature of the programs, services, or activities being offered.

*Id.*[1] The regulations of the Department of Justice ("DOJ") implementing Title II are entitled to deference and "warrant respect." *Olmstead v. L.C.*, 527 U.S. 581, 597–98 (1999). Guidance from the DOJ regarding interpretation of its own regulations is similarly entitled to deference. *See Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016) (citing *Olmstead* and stating that the degree of deference owed to DOJ's guidance under Title II is to "defer to an agency's interpretation of its own regulation unless the agency's interpretation is plainly erroneous or inconsistent with the regulation or there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question").

Courts in other Circuits have interpreted the ADA to apply to a Title II or Section 504 defendant's website. *See Hindel v. Husted*, No. 2:15-cv-3061, 2017 WL 432839, at *5 (S.D. Ohio Feb. 1, 2017) (granting permanent injunction to Plaintiffs requiring Ohio Secretary of State to make its website accessible and finding that Plaintiffs established that website violated Title II of the ADA because it was inaccessible to blind individuals utilizing screen access software); *see also Innes v. Bd. of Regents of the Univ. Sys. of Md.*, No. DKC-13-2800, 2015 WL 1210484, at *10 (D. Md. Mar. 16, 2015) (finding that Section 504 applied to content on Defendant-University's website because the website was properly considered a "program or activity" of the

---

[1] Under Title III of the ADA, the Seventh Circuit has recognized that the ADA reaches wherever a defendant provides its services, including over the Internet. *See Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001) (analyzing claim under Title III and stating "An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store . . . The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public."); *accord Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (interpreting Title III of the ADA as prohibiting the exclusion of people with disabilities from entering a facility and using the facility in the same way as people without disabilities whether the facility is "in physical space or in electronic space").

entity receiving federal financial assistance and "'Program or activity' is defined as *all* of the operations of 'a college, university, or other postsecondary institution, or a public system of higher education.'") (quoting 29 U.S.C. § 794(a)).

FSSA is an agency of the State of Indiana that administers Indiana's health care and social services programs. DFR is a division of FSSA responsible for administering Medicaid, SNAP, and TANF benefits. *See* [Filing No. 66-14 at 7–8 (A. Shields Dep. pp. 45:17–46:19).]. Such benefits programs clearly fall within the scope of a "service, program, or activity" of a public entity under the ADA. Defendants' websites, which convey information related to their benefits programs and allow individuals to submit online applications for benefits, are themselves a "service, program, or activity" of the public entity.

Defendants maintain and support the Benefits Portal through a vendor, RCR Technology. *See* [Filing No. 66-9 at 19–21.]. The central purpose of the Benefits Portal is to allow Indiana residents to apply for public assistance benefits online. *See* [Filing No. 66-17 at 39 (J. Montgomery Dep. p. 87:1–12)]; [Filing No. 66-21 at 7–8 (DFR 30(b)(6) Dep. J. Montgomery pp. 9:7–10:13).]. The website is also mandated by several federal agencies, including the Department of Health and Human Services, Medicare and Medicaid Services, the Administration for Children and Families, and Food and Nutrition Services. [Filing No. 66-21 at 7–8 (DFR 30(b)(6) J. Montgomery Dep. pp. 9:7–10:13).]. Visitors to the Benefits Portal website may also access "downstream tools" that allow them to "check the status of pending applications," "check their eligibility status in general," "provide online changes . . . in status" and utilize a "screening tool . . . to determine if . . . there's a possibility [to be] eligible for one of the programs." [Filing No. 66-21 at 47–49 (DFR 30(b)(6) Dep. J. Montgomery pp. 67:19–69:6).]. Web traffic on the Benefit Portal totals "hundreds of thousands" of visitors over the course of a year, [Filing No.

17

66-21 at 10–11 (DFR 30(b)(6) Dep. J. Montgomery pp. 12:19–13:11)], and approximately "60 to

80 percent" of all benefits applications submitted to DFR are received through the Benefits

Portal. [Filing No. 66-21 at 12–13 (DFR 30(b)(6) Dep. J. Montgomery pp. 14:17–15:6).].

Defendants acknowledge that their websites are a gateway to information concerning

Indiana's public assistance benefits. The FSSA home page was described as a "front door of

[the] agency" whose purpose is "to steer people in all of the right directions to – help them get

services." [Filing No. 66-19 at 39 (FSSA 30(b)(6) Dep. J. Linder p. 77:5–19).]. FSSA's

Medicaid page is similarly "the landing page and the home page for Medicaid specifically."

[Filing No. 66-19 at 46–47 (FSSA 30(b)(6) Dep. J. Linder pp. 86:14–87:19).]. Both domains are

a critical access point for resources and services. From the FSSA home page, visitors can reach

pages for each division within FSSA. Visitors may also: obtain resources for child-care and

education, such as finding licensed child-care providers using an interactive search tool; obtain

assistance seeking employment; access information about the various benefits programs

available and eligibility requirements; and locate the nearest local DFR office. *See* [Filing No.

66-26 at 16–17.]. On the Indiana Medicaid domain, users may apply for Medicaid coverage, find

a Medicaid provider, and learn information regarding Medicaid member rights and

responsibilities, among other things. [Filing No. 66-26 at 17–18.]. The amount of information

conveyed on Defendants' websites is extensive, and the websites allow for users to both learn

information and engage in necessary transactions to obtain benefits.

## III.    Defendants Are Violating Title II of the ADA and Section 504.

Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity

to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. §

12132. The regulations implementing Title II provide that a public entity providing any aid,

benefit or service may not discriminate on the basis of disability by: "deny[ing] a qualified

individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service," *see* 28 C.F.R. § 35.130(b)(1)(i), "afford[ing] a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others" 28 C.F.R. § 35.130(b)(1)(ii), or by "provid[ing] a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii). Public entities must also make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

Under Title II, a public entity is liable for its own discriminatory actions and the discriminatory actions of private entities with whom it has a contractual relationship.  *See, e.g.*, 28 C.F.R. § 35.130(b)(1) ("[a] public entity, in providing any . . . service, may not, directly or through contractual . . . arrangements [discriminate] on the basis of disability"); 28 C.F.R. Pt. 35 App. B (2017) ("All governmental activities of public entities are covered, even if they are carried out by contractors."). According to Title II's Technical Assistance Manual, a defendant may be liable for the violations of its contractors even if those contractors are private entities not themselves subject to Title II.  *See* Technical Assistance Manual, 42 U.S.C. § 12206(c)(3), Part II-1.3000.

Section 504 prohibits an entity receiving federal financial assistance from failing to "[a]fford a qualified [individual with a disability] an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified [individuals with disabilities] with "an aid, benefit, or service that is not as effective as that provided to others." 45 C.F.R. § 84.4(b)(1)(ii)-(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

Title II and Section 504 specifically require public entities and federally funded programs to offer communications with individuals with disabilities that are as effective as communications with others, and to provide auxiliary aids and services where necessary to afford individuals with disabilities an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity. *See generally* 28 C.F.R. § 35.160. For the communications to be effective, "auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b)(2). Public entities must give "primary consideration to the requests of individuals with disabilities" when considering what types of auxiliary aids and services are necessary. *Id.*

Defendants have failed to provide Plaintiffs with equally effective access to Defendants' print and website communications and, as a result, have denied Plaintiffs an equal opportunity to participate in and enjoy the benefits of Defendants' services, programs, or activities. Plaintiffs and blind Hoosiers cannot access vital correspondence and information in a manner that is "equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii).

A.     **Defendants' print communications are inaccessible to the blind.**

Defendants routinely communicate with Hoosiers receiving health coverage benefits and food and cash assistance through written correspondence. Such correspondence includes notices regarding Medicaid, SNAP, and/or TANF approvals, renewals, discontinuances, and denials, name change notices, interview appointment notices, redetermination summaries, and proof of eligibility notices, among other communications. *See* [Filing No. 66-9 at 12–17.]. Defendants provide all written correspondence in standard print unless the benefits applicant or recipient affirmatively requests an alternative format. [Filing No. 66-14 at 17–18 (A. Shields Dep. pp. 69:13–70:13).].

20

Defendants' records demonstrate multiple requests for Braille correspondence from Christopher Meyer beginning on December 13, 2017. *See* [Filing No. 66-27 at 2, 4, 5, 28, 32, 35 (demonstrating requests for Braille on January 29, 2018, January 31, 2018, May 1, 2018, June 14, 2018 and June 29, 2018, February 4, 2019).]. Defendants first mailed Mr. Meyer Braille documents on August 7, 2019—one day after the filing of Plaintiffs' complaint. *See* [Filing No. 66-27 at 25]; [Filing No. 66-3 at 30 (C. Meyer Dep. p. 51:6–9) (Mr. Meyer stating that he first received Braille documents "three or four days after we filed the complaint").]. Sarah Meyer's requested Braille on May 13, 2019 and May 21, 2019, *see* [Filing No. 66-34 at 2–3] and Defendants did not begin mailing Ms. Meyer Braille documents until after September 26, 2019. [Filing No. 66-29 at 2). Similarly, Kaiti Shelton requested Braille correspondence on April 18, 2019 and has yet to receive any Braille documents from Defendants. [Filing No. 66-11 at 3, ¶ 6.]. While Defendants have started to provide Braille documents to Christopher Meyer and Sarah Meyer, the quality of the Braille is so poor that it is at times wholly unreadable. [Filing No. 66-3 at 36–37 (C. Meyer Dep. pp. 57:24–58:20)]; [Filing No. 66-4 at 41–42 (S. Meyer Dep. pp. 52:25–53:11).].

Defendants lack proper staff training and quality control measures to ensure that its Braille communications are accessible. Braille that is indecipherable, or of such poor quality that it takes hours for a blind individual to understand, violates Title II and Section 504.

**1.      Defendants' Braille documents are low-quality and demonstrate a lack of knowledge regarding proper Braille production.**

At Plaintiffs Christopher Meyer's and Sarah Meyer's depositions, they each testified to the myriad problems with the quality of Defendants' Braille documents, including indecipherable symbols and improper formatting and spacing. One Braille document that was mailed to Mr. Meyer contained the Indiana State seal, which obscured the date and month at the top of the

letter. *See* [Filing No. 66-3 at 36–38 (C. Meyer Dep. pp. 57:24–59:25 (describing problems with Braille documents).]. The Braille documents that both Mr. Meyer and Ms. Meyer received were in a single stack, uncollated, and attached in a "fan-fold formation" with Braille characters printed along the perforated edges, making it difficult or near-impossible to read the Braille text when the pages were separated. [Filing No. 66-3 at 36–38 (C. Meyer Dep. pp. 57:24–59:25)]; [Filing No. 66-4 at 36 (S. Meyer Dep. p. 47:2–12).]. Sarah Meyer testified during her deposition that a copy of a Braille document that she had received included "wonky symbols" and was prepared in uncontracted Braille, making it difficult to read. [Filing No. 66-4 at 38–39 (S. Meyer Dep. pp. 49:12–50:1).]. She described the Braille as "very poor." [Filing No. 66-4 at 44 (S. Meyer Dep. p. 55:22).].

Plaintiffs' Braille expert, Jennifer Dunnam, confirmed the poor quality of the Braille documents that Mr. Meyer and Ms. Meyer received, stating in her report that the documents "did not show even a basic understanding of the standard representative capitalization, numbers, punctuation, contractions, and formatting for navigability." [Filing No. 66-25 at 9.]. Ms. Dunnam noted several problems with the Braille documents. First, some documents were prepared using ASCII, or "computer Braille" which lacks standard translation for punctuation and symbols. [Filing No. 66-25 at 10.]. Second, some documents were not collated or formatted with proper margins. [Filing No. 66-25 at 11.]. Other documents contained large amounts of blank space or lacked page numbers altogether. [Filing No. 66-25 at 12.]. Certain lines in the documents were illegible and contained anomalous symbols. [Filing No. 66-25 at 12–13.]. Ms. Dunnam opined that the documents "reflect little to no knowledge on the part of the preparer of how to properly format and translate a Braille document or how to verify a Braille document for accuracy." [Filing No. 66-25 at 13.]. Ms. Dunnam concluded that "[i]n most instances, the quality of the

Braille is so poor that the documents are impossible to read, or would take hours for a reader to understand. [Filing No. 66-25 at 13.].

The quality of Defendants' Braille documents is a direct reflection of the inadequate training Defendants provide their staff on how to produce Braille communications and the lack of any quality control measures to ensure that all Braille communications are accessible. DFR employee, Jasmine Holliday, is responsible for preparing DFR's Braille correspondence. [Filing No. 66-15 at 10 (J. Holliday Dep. p. 19:6–11).]. Ms. Holliday does not read Braille and has no Braille certifications. [Filing No. 66-15 at 8, 17 (J. Holliday Dep. pp. 17:2–5; 27:13–18).]. She testified during her deposition that she relies exclusively on a computer program for Braille transcription and cannot independently confirm that the Braille text is accurate. [Filing No. 66-15 at 18–22 (J. Holliday Dep. pp. 28:16–32:13).].

Ms. Holliday received little training on Braille production. An employee of the Division of Disability and Rehabilitative Services instructed Ms. Holliday on how to use an embosser that DFR purchased for the purpose of producing Braille documents, and Ms. Holliday attended a web-based Braille training program. [Filing No. 66-15 at 7, 30–31 (J. Holliday Dep. 16:11–12; 83:11–84:3)]; [Filing No. 66-14 at 28–30 (A. Shields Dep. pp. 125:7–127:2).]. Defendants acknowledged that after a Braille document is prepared, they take no steps to independently verify that the document is legible and accurate to a Braille reader. *See* [Filing No. 66-20 at 42–43 (DFR 30(b)(6) A. Shields Dep. pp. 103:3–104:1)]; [Filing No. 66-14 at 31 (A. Shields Dep. p. 128:1–9).].

      **2.**      **Defendants' contractors continue to provide inaccessible standard print documents.**

While Defendants have started to provide Braille documents to Mr. Meyer and Ms. Meyer, their contractors do not provide documents in alternative formats. For example,

Christopher Meyer and Kaiti Shelton continue to receive standard print notices from Managed Health Services ("MHS"), a health insurance provider servicing Indiana Medicaid recipients. [Filing No. 66-11 at 2–3, ¶¶ 2, 9]; [Filing No. 66-12, at 2 ¶ 3.]. Mr. Meyer has made multiple requests to MHS for Braille communications, including most recently in or about January 2020. [Filing No. 66-12 at 2, ¶ 3.]. To date, MHS has not provided any Braille communications to Mr. Meyer. [Filing No. 66-12 at 2, ¶ 3.]. Rather, MHS continues to send standard print notices to Mr. Meyer that contain critical information about his benefits, including notices denying coverage for prescription medication and mental health services. [Filing No. 66-12 at 2–3 ¶¶ 3–5.].

Ms. Shelton notified MHS that she is blind and requested all print correspondence in Braille or electronic format. [Filing No. 66-11 at 3, ¶ 8.]. While MHS has provided some general documents, such as member brochures and flyers in an accessible electronic format, MHS has yet to provide any correspondence specific to Ms. Shelton in either an accessible electronic format or Braille. [Filing No. 66-11 at 3, ¶ 9.].

**B.    Accessibility barriers exist on Defendants' websites.**

For sighted and blind persons, the Internet is a significant source of information, services, and transactions with instant and 24/7 availability and without the need to travel to attain them. The blind access the Internet from mobile devices and/or personal computers by using keyboards or touch-screen gestures in conjunction with screen access software, which vocalize textual information presented visually on a computer screen or display that information on a user-provided refreshable Braille display. JAWS and NVDA are two examples of such screen-access software, commonly referred to as "screen readers." Director Shields acknowledged that JAWS is the most utilized software by visually-impaired recipients. [Filing No. 66-14 at 71–74 (A. Shields Dep. pp. 221:8–224:7).]. Screen access software provides the only method by which

24

blind persons can independently access the Internet and associated computer programs. When Internet websites are not designed to allow for use with screen access software, blind persons are unable to fully access the information, products, and services offered through the Internet.

The barriers described below were identified by Plaintiffs' expert, Terri Youngblood, during her evaluations of Defendants' websites. Defendants have maintained throughout this lawsuit that its websites are accessible, *see* [Filing No. 66-16 at 18–19 (S. Beam Dep. pp. 50:17–51:1)]; [Filing No. 66-21 at 69–70 (DFR 30(b)(6) J. Montgomery Dep. pp. 103:11–104:4)]; [Filing No. 66-14 at 47 (A. Shields Dep p. 185:6–10)]; [Filing No. 66-19 at 60–61 (FSSA 30(b)(6) Dep. J. Linder pp. 121:10–122:4)], yet there is no evidence in the record that the barriers no longer exist, nor is there any evidence to rebut or contradict Ms. Youngblood's findings.

**3.      Accessibility barriers pervade the Benefits Portal.**

Defendants' websites contain accessibility barriers that preclude blind individuals from accessing vital information. Mr. Meyer testified to the barriers he encountered on the Benefits Portal when attempting to apply for benefits on or about March 2018. [Filing No. 66-3 at 43–44 (C. Meyer Dep. pp. 64:11–65:4).]. Mr. Meyer was unable to complete the application independently because certain text fields on the application page, known as "form fields," were not accessible. [Filing No. 66-3 at 43–44 (C. Meyer Dep. pp. 64:11–65:4).]. Plaintiffs' web accessibility expert, Terri Youngblood, confirmed the existence of such barriers and identified several other barriers across the Benefits Portal website. *See generally* [Filing No. 66-26 at 51–71.].

Ms. Youngblood reported barriers on the Benefits Portal landing page and within the online benefits application process. *See generally* [Filing No. 66-26 at 51–71.].Within the online application, Ms. Youngblood confirmed Mr. Meyer's experience that at many places throughout

the online application, form fields are not read aloud to a blind person using a screen reader. [Filing No. 66-26 at 51–71.]. For example, on the page where applicants input their home address, the following fields, among others, are inaccessible: (1) country; (2) Do you have a mailing address different than your home address?; (3) Are you currently enrolled in a health plan or program? *See* [Filing No. 66-26 at 60.]. In the "Information About You" section of the online application, the following form fields, among others, are also inaccessible: (1) Suffix; (2) Gender; (3) Marital Status; (4) State; (5) County; (6) How many people are living at this address including you?; (7) Are you currently enrolled in a health plan or program? [Filing No. 66-26 at 61.]. Several other pages within the online application contained inaccessible form fields, including the following pages: More About You; Tobacco Usage Information About You; More Contact Information; Additional Information; Navigator Information; Health Plan Selection; Household Member Details; More Household Members; Household Relationship; Additional Information for all Applicants; Tax dependent Information; Income Information; Resource Information; and Mail Authorize Representative Form and Voter Registration Form. [Filing No. 66-26 at 62–71.].

In addition to inaccessible form fields on the Benefits Portal application, Ms. Youngblood also observed color contrast issues and inaccessible icons throughout the Benefits Portal website. The orange background with white text color combination on the Benefits Portal login pop-up is "exceedingly difficult to read for people who are Blind." [Filing No. 66-26 at 57.]. Similarly, "[g]reen buttons with white text are also difficult to read" and "do not meet color contrast requirements." [Filing No. 66-26 at 57.]. Additionally, the login page of the Benefits Portal includes inaccessible "Forgot User ID/Password" links, and the icons for an

applicant to request help are only accessible if a mouse hovers over the icon; the help icon is not accessible via a screen reader. [Filing No. 66-26 at 57–58.].

### 4. Accessibility barriers are present on Defendants' other webpages.

Ms. Youngblood reported accessibility barriers on the FSSA website (www.in.gov/fssa), the Indiana Medicaid website (www.in.gov/medicaid), and several webpages within those domains. Ms. Youngblood tested the FSSA and Indiana Medicaid domains and sub-domains in March 2020 and noted many barriers, including the following:

> A user cannot access the "search" button by using keyboard navigation and the button is not labeled as such, so a screen reader interprets this button as static text only.

> The "Advanced Search" feature at the bottom of the FSSA home page contains unlabeled form fields.

> The "search results" page does not announce when no results are found.

> The drop-down buttons in the side navigation column are not recognized by screen readers as expandable buttons, so a blind user cannot navigate to any information within the drop-down menus.

> Within the "Child Care and Education" page, the pop-up window that appears after a user selects the "Find Childcare" feature is not accessible. The window does not appear to a screen reader user and therefore the text inside the window is not announced.

> The form fields to filter a list of Child Care providers are "completely inaccessible for people who use a screen reader."

> The color-coded Child Care and Development Fund Eligibility Map is not fully tagged for accessibility, and therefore a blind individual does not know what information is contained in the map.

> A table illustrating the income limits and maximum SNAP allotment is not accessible. The table's headers are not associated with the cell data, and screen reader users are not able to determine SNAP income limits.

> The search box to find a local DFR office does not announce that it is a search box, but rather announces "Frame Edit," so a blind individual using a screen reader is unable to access the search tool.

The form fields in the HIP eligibility and contribution calculator are not labeled. A blind person using a screen reader would only hear the word "edit" on each form field.

HIP documents and press releases are minimally accessible. Some documents are scanned, static documents, which a screen reader cannot recognize. Other documents are text files with missing tags and alt text on headers.

The Medicaid home page contains text and images with poor color contrast, lacked a visual focus, and do not announce the side menu.

At least two forms on the Medicaid page—the "Authorized Representative Form" and the Indiana Health Coverage Programs "Personal Representative Authorization" form—are accessible to read, but not fillable, thereby preventing a blind user from inputting any information into the forms.

*See generally* [Filing No. 66-26 at 22–45.]. The myriad accessibility barriers on

Defendants' websites demonstrate that Defendants fail to communicate with blind users

as effectively as they communicate with sighted ones.

### 5. Defendants lack policies and procedures to identify and remediate accessibility barriers.

Defendants have acknowledged that they completely delegate ADA compliance to their

vendors. [Filing No. 66-21 at 20–24, 59–60 (DFR 30(b)(6) Dep. J. Montgomery pp. 22:19–26:1;

79:20–80:12).]. With respect to the Benefits Portal, the only "policy" that DFR communicates to

its vendors concerning website accessibility is its expectation that the vendor complies with all

federal laws. *See* [Filing No. 66-17 at 14, 16–18 (J. Montgomery Dep. pp. 57:2–12; 59:16–

61:1).]. This expectation is included in the vendor contract, and DFR provides no further support

or guidance regarding compliance. [Filing No. 66-17 at 18–19 (J. Montgomery Dep. pp. 61:21–

62:11).]. Jeffrey Montgomery testified during his deposition that DFR expects the vendor to

"figure out federal law for themselves and figure out policies for themselves . . ." [Filing No. 66-

17 at 18 (J. Montgomery Dep. p. 61:2–10).]. Not only does DFR lack its own policies regarding

website accessibility, it has no policy to monitor accessibility compliance through routine

website testing or audits. [Filing No. 66-21 at 39–40, 61–62 (DFR 30(b)(6) Dep. J. Montgomery pp. 59:15–60:5, 81:18–82:3).]. Jeffrey Montgomery testified during his deposition that, while DFR utilizes testers to monitor its websites for compliance with business requirements, those testers do not monitor accessibility. [Filing No. 66-17 at 20–21, 22–24, 46 (J. Montgomery Dep. pp. 63:12–64:9, 65:19–67:3, 120:6–20).]. Vendors working with DFR are expected to maintain compliance, [Filing No. 66-17 at 21–22 (J. Montgomery Dep. pp. 64:10–65:18)], and to remediate any errors they might find. [Filing No. 66-17 at 28–29 (J. Montgomery Dep. pp. 71:16–72:7).]. DFR has no policy in effect to verify whether an accessibility barrier has been successfully remediated. [Filing No. 66-17 at 29–32 (J. Montgomery Dep. pp. 72:8–75:14).].

FSSA takes a similar hands-off approach to website accessibility issues. In its vendor contracts, FSSA communicates its expectation that the vendor will comply with Section 508 of the Rehabilitation Act. [Filing No. 66-19 at 19–20, 29–32 (FSSA 30(b)(6) Dep. J. Linder pp. 57:10–58:3; 67:7–70:12).]. However, FSSA does not perform ongoing testing specifically for accessibility issues and has no dedicated employees responsible for ensuring that its homepage and Indiana Medicaid websites are accessible. [Filing No. 66-19 at 15, 29–32 (FSSA 30(b)(6) Dep. J. Linder pp. 53:3–11; 67:7–70:12).]. FSSA performs regular tests and audits of its websites to assess for functionality, but it does not specifically test for accessibility. [Filing No. 66-19 at 22–25, (FSSA 30(b)(6) Dep. J. Linder pp. 60:18–61:14; 62:16–63:18).].

## IV.     This Court Should Award Plaintiffs Injunctive Relief.

Injunctive relief is necessary and appropriate here because Defendants continue to deny Plaintiffs equally effective access to print and website communications concerning life-sustaining government benefits. Defendants' contractors continue to send standard print documents, and Defendants lack the necessary training and policies to ensure that all Braille documents they produce are accessible. Accessibility barriers are also littered throughout

Defendants' websites, and Defendants lack any policies or protocol to routinely identify and promptly remediate these barriers.

Given these continued violations, this Court should grant a permanent injunction requiring Defendants and their contractors to (1) provide equal access to print communications in secure, accessible formats, including Braille; (2) remediate Defendants' websites so that they provide equally effective communication to the blind; and (3) implement policies, procedures, and practices to ensure that blind individuals are consistently provided with fully accessible alternative formats and websites are continuously maintained in an accessible state.

## A.    Plaintiffs Satisfy the Four-Prong Test for Injunctive Relief.

To obtain a permanent injunction, Plaintiffs must demonstrate:

'(1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'

*Vaughn v. Walthall*, 968 F.3d 814, 824 (7th Cir. 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Plaintiffs satisfy all four requirements. First, Plaintiffs have suffered an irreparable injury because they have experienced, and continue to experience, the denial of equally effective communication. Despite repeated requests, Defendants have ignored the requests for Braille communications from Christopher Meyer, Sarah Meyer, and Kaiti Shelton. Defendants still have not produced any Braille documents to Kaiti Shelton. The quality of the Braille that Defendants have produced is so poor that it is at times unintelligible or requires considerable effort on the part of Mr. and Ms. Meyer to read. Plaintiffs are also deprived of an equal opportunity to access the information and services Defendants make available to sighted individuals through their websites. The accessibility barriers on Defendants' websites preclude blind individuals from

30

completing applications for government benefits and from obtaining information related to benefits programs and other vital resources.

Second, given the discriminatory nature of the harm suffered by Plaintiffs, monetary damages are inadequate to compensate for their injuries.

Third, a remedy in equity is warranted because Plaintiffs' requested relief will not pose a hardship to Defendants. To the extent that Defendants argue that they already provide Braille communications and accessible websites, requiring Defendants to implement policies and practices to ensure that the Braille communications are accurate and readable and that website barriers are remediated is relatively insignificant. Moreover, the ADA and Section 504 allow Defendants to raise the affirmative defenses of undue burden or fundamental alteration as an excuse to compliance, *see* 28 C.F.R. § 35.150(a)(3); 28 C.F.R. § 35.164; 28 C.F.R. § 41.53. However, the record here does not support either defense.

Under Title II of the ADA, an assessment of whether compliance would result in an undue burden or fundamental alteration "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity." 28 C.F.R. § 35.164. Here, neither the heads of FSSA and DFR, or their designees, have determined that Plaintiffs' requested relief would pose an undue burden. *See* [Filing No. 66-18 at 14–16 (FSSA 30(b)(6) Dep. A. Shields pp. 61:3–63:16)]; [Filing No. 66-20 at 55–57 (DFR 30(b)(6) Dep. A. Shields pp. 137:12–139:20).] For Fiscal Year 2020, the amount allocated in FSSA's general fund is 4.9 billion dollars. [Filing No. 66-20 at 50–51 (DFR 30(b)(6) Dep. A. Shields pp. 132:19–133:18).]. Of that amount, approximately 133 million dollars are allocated to DFR. [Filing No. 66-20 at 50–51 (DFR 30(b)(6) Dep. A. Shields pp.

132:19–133:18).]. The costs associated with Plaintiffs' requested relief, relative to Defendants' available resources, is likely to be insignificant.

Granting a permanent injunction would also not constitute a fundamental alteration. Defendants already communicate with the constituents to whom they provide services. Plaintiffs' requested relief requires Defendants to communicate with blind individuals in as equally effective a manner as Defendants communicate with sighted individuals. Requiring Defendants and their contractors to produce accessible alternative formats, including readable Braille documents, and to remediate all accessibility barriers on their websites promotes communication.

Finally, an injunction is in the public interest because it serves the broader purpose of the ADA and Section 504 by ending the discriminatory treatment of individuals with disabilities and may benefit several hundred blind individuals currently receiving government benefits from the State of Indiana. *See Mortland v. Lights Out Developments, LLC*, No. 1:19-CV-2557-JMS-DLP, 2020 WL 3577867, at *2 (S.D. Ind. July 1, 2020) ("And finally, the public has a strong interest in eliminating discrimination and in enforcing the ADA, as that statute was intended to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.") (citation omitted); [Filing No. 66-14 at 25–26 (A. Shields. Dep. pp. 122:17–123:10) (noting that 200 blind individuals in Indiana are recipients of Medicaid for the Blind).].

**B.      This Court Should Grant a Permanent Injunction Requiring Defendants and their Contractors to Provide Equal Access to Print Communications in Secure, Accessible Formats.**

Defendants and their contractors continue to deny equal access to their print communications. Despite multiple requests for Braille or electronic formats, FSSA and DFR have yet to produce any accessible documents to Kaiti Shelton. [Filing No. 66-11 at 3, ¶¶ 5–6.]. Defendants' contractors similarly provide inaccessible print communications. [Filing No. 66-12

at 2, ¶ 3]; [Filing No. 66-11 at 3, ¶¶ 8–9.]. This Court should prohibit Defendants from violating Title II and Section 504 by requiring them to provide blind persons with secure, accessible formats.

This Court should also require Defendants to implement policies regarding the timely production of Braille documents, training in Braille preparation, and quality control measures for all Braille documents Defendants produce. Defendants must timely produce print communications in accessible formats and, where there is a delay in the production of such communications, Defendants must extend any response period by at least the number of days that it took Defendants or their contractors to send the communications in the accessible formats. Defendants have implemented a policy for providing Braille communications when an applicant affirmatively requests Braille as their preferred alternative format. However, as described above, the quality of Defendants' Braille documents is so poor that substantial information is unreadable or requires great effort on the part of the reader to understand. *See generally* [Filing No. 66-25 at 9–13.]. A policy requiring Defendants to adequately train staff in the preparation of Braille documents and to implement quality assurance measures would ensure that all future Braille communications are accessible.

The record demonstrates that the DFR staff person responsible for producing Braille documents cannot read Braille, *see* [Filing No. 66-15 at 17 (J. Holliday Dep. p. 27:13–18)], and that Defendants have no procedure to independently verify the accuracy of the Braille produced. [Filing No. 66-15 at 18–22 (J. Holliday Dep. pp. 28:16–29:3, 30:14–31:16, 31:18–32:13).]. Plaintiffs' expert, Jennifer Dunnam, testified that "someone with expertise in Braille should be involved" in the production of Braille documents, "whether that person became an expert or was hired as an expert." [Filing No. 66-24 at 14 (J. Dunnam Dep. p. 40:2–10).] This recommendation

is critical because Defendants lack the expertise to corroborate obvious deficiencies in the Braille

documents. Even after learning of the issues that Christopher Meyer reported with the quality of

Braille documents he received, FSSA concluded that there were no errors in production that it

needed to resolve. [Filing No. 66-18 at 7–9 (FSSA 30(b)(6) Dep. A. Shields pp. 54:8–56:10).].

For example, FSSA concluded that there were no issues with printing Braille documents as one

continuous sheet, *see* [Filing No. 66-18 at 7–8 (FSSA 30(b)(6) Dep. A. Shields pp. 54:8–55:5).].

Yet Jennifer Dunnam explained in her report that by leaving Braille documents in the "fan-fold

formation," the pages are not collated. [Filing No. 66-25 at 11–12.] A review of the Braille

document by someone who can read Braille would identify these and other errors before the

document is mailed to FSSA and DFR constituents—a necessary backstop to producing

inaccessible communications.

### C.    This Court Should Grant a Permanent Injunction Requiring Defendants to Remediate Existing Website Barriers and Implement a Six-Part Protocol to Maintain Web Accessibility.

Plaintiffs' web accessibility expert, Terri Youngblood, evaluated Defendants' websites

against the World Wide Web Content Accessibility Guidelines ("WCAG") version 2.1. WCAG

2.1. is widely viewed as the standard barometer for measuring website accessibility.[2]

Ms. Youngblood testified that developing Defendants' websites according to the WCAG 2.1 AA

standards would resolve the existing accessibility problems. *See generally* [Filing No. 66-26 at 4,

¶ 11, 13–71]; [Filing No. 66-23 at 15 (T. Youngblood Dep. 84:12–20).]. This Court should order

Defendants to undertake a full accessibility audit of each website and develop a remediation plan

for correcting existing barriers.

---

[2]  In 2017, the federal government incorporated WCAG 2.0 Level A and Level AA as the standard with which all federal agencies and contractors must comply. *See* 80 Fed. Register 5790, 5791 (Jan. 18, 2017) (codified at 36 CFR Parts 1193 and 1194).

In addition to remediating the current accessibility barriers, Ms. Youngblood explained in her expert report that maintaining an accessible website "requires the organization to develop policies and procedures that make a commitment to compliance with accessibility standards." [Filing No. 66-26 at 48.]. Ms. Youngblood set forth six discrete steps that organizations should take to ensure that accessibility practices are maintained long-term: (1) develop an accessibility policy which will establish the standards, the commitment, the roles and responsibilities, and implementation processes; (2) hire or assign a web accessibility coordinator who is responsible for oversight of the websites; (3) establish a remediation prioritization process; (4) develop or obtain accessibility training for any staff that are responsible for updating or maintaining web content; (5) retain an independent accessibility consultant to provide a written evaluation of the websites and to make recommendations to improve their accessibility; and (6) develop regular monitoring and reporting to ensure that accessibility is maintained. [Filing No. 66-26 at 48.]

Defendants have failed to identify a web accessibility expert of their own to rebut or otherwise challenge the reasonableness and feasibility of Ms. Youngblood's recommendations.

## <u>CONCLUSION</u>

For the reasons described herein, this Court should enter judgment in favor of Plaintiffs and require Defendants to: (1) ensure that Plaintiffs have equally effective access to Defendants' print communications; (2) remediate their websites so that the websites provide blind individuals with equal access to all information, transactions, and resources; and (3) adopt policies, procedures, and training necessary to maintain effective communication with blind individuals.

Dated:  October 6, 2020

Respectfully submitted,

*/s/ Chelsea J. Crawford*
Joseph B. Espo
Chelsea J. Crawford
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T:  (410) 962-1030
F:  (410) 385-0869
jbe@browngold.com
ccrawford@browngold.com

Thomas E. Crishon
Emily A. Munson
INDIANA DISABILITY RIGHTS
4701 North Keystone Avenue, Suite 222
Indianapolis, Indiana 46205
T:  (317) 722-5555
F:  (317) 722-5564
tcrishon@indianadisabilityrights.org
emunson1@indianadisabilityrights.org

Jana Eisinger
LAW OFFICE OF JANA EISINGER, PLLC
4610 South Ulster Street, Suite 150
Denver, Colorado 80237
T:  (303) 209-0266
F:  (303) 353-0786
jeisinger@eisingerlawfirm.com

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of October 2020, a copy of Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

/s/ *Chelsea J. Crawford*
Chelsea J. Crawford